## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| EAGLE HILL CONSULTING, LLC, | ) |
| Plaintiff, | ) |
| v. | ) No. 23-2194 |
| THE UNITED STATES, | ) Filed: April 19, 2024 |
| Defendant, | ) Re-issued: May 1, 2024* |
| and | ) |
| POTOMACWAVE CONSULTING, INC., | ) |
| Defendant-Intervenor. | ) |

## <u>OPINION AND ORDER</u>

In this post-award bid protest, Plaintiff Eagle Hill Consulting, LLC ("Eagle Hill") contends that the Federal Emergency Management Agency ("FEMA" or "Agency") improperly awarded a contract for administrative support services to Defendant-Intervenor PotomacWave Consulting, Inc. ("PotomacWave"). Specifically, Eagle Hill alleges that FEMA's evaluation of the solicitation's Corporate Experience and Price Factors was flawed. Before the Court are the parties' dispositive motions, the Government's Motion to Strike exhibits filed by Plaintiff, and separate requests from both the Government and Plaintiff to supplement the administrative record with extra-record facts. As explained below, the Court **DENIES AS MOOT** the Government's Motion to Strike, **GRANTS** the Government's Motion to Supplement the Administrative Record, and

---

* The Court issued this opinion under seal on April 19, 2024, and directed the parties to file any proposed redactions by April 26, 2024. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

**GRANTS IN PART** and **DENIES IN PART** Eagle Hill's Motion to Supplement the Administrative Record. Further, the Court **DENIES** Eagle Hill's Motion for Judgment on the Administrative Record, **GRANTS** PotomacWave's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record, and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record.

## I.   BACKGROUND

### A.   The Solicitation

On June 22, 2023, FEMA issued Request for Quotations No. RFQ1631725 ("RFQ" or "Solicitation") under Federal Acquisition Regulation ("FAR") Subpart 8.4. Admin. R. at 960, ECF No. 22-2.[1] FEMA sought to award a single award, firm fixed-price blanket purchase agreement ("BPA") to a General Services Administration ("GSA") Federal Supply Schedule contract holder with special line-item number ("SLIN") 541611. *Id.* The purpose of the Solicitation was to provide FEMA's Office of Policy and Analysis and Field Operations Directorate ("FOD") with administrative support for the development and implementation of FOD's Strategic Plan, establishment of a resource allocation planning process, implementation of change management initiatives, enhancement of internal and external communications, and leadership over the design and implementation of the FEMA Readiness Cycle. *Id.* The RFQ contemplated a period of performance consisting of one base year and four one-year options. *Id.*

The RFQ advised that FEMA would make an award on a best value tradeoff basis, considering the following factors: (1) Factor 1 Corporate Experience; (2) Factor 2 Oral Presentation; and (3) Factor 3 Price. AR 961. The Corporate Experience Factor was more

---

[1] For ease of reference, citations to the administrative record refer to the bates-labeled page numbers rather than the ECF page numbers.

important than the Oral Presentation Factor, which was more important than the Price Factor.  *Id.*

When combined, the Corporate Experience and Oral Presentation Factors were significantly more

important than price.  *Id.*  The RFQ provided for a two-phased evaluation.  In Phase I, FEMA

would select the highest rated offerors based on an evaluation of Corporate Experience.  *Id.*  Those

offerors would be invited to proceed to Phase II for evaluation of Oral Presentation and Price.  AR

962.

  As relevant here, the "Instructions, Conditions, and Notices to Respondents" section of the

RFQ provided the following:

**Quote Organization**
The Government will conduct a detailed evaluation of each Contractor's approach and capability to meet the Government's requirement against the following evaluation factors:

The Evaluation Factors are as follows in the descending order of importance:

| The Evaluation Factors are as follows:<br>Phase I | Limit |
|---|---|
| Factor 1 – Corporate Experience | 10 pages |
| **Phase II** | **Limit** |
| Factor 2 – Oral Presentation | Up to 1 hour |
| Factor 3 – Price | See "Excel Spreadsheet for Format" |

AR 961.

  The  RFQ's  "Evaluation  Criteria"  section  described  how  FEMA  would  evaluate  each

evaluation factor.  Factor 1 Corporate Experience required offerors to submit written responses to

five  questions  so  that  FEMA  could  "assess  its  level  of  confidence  that  the  Contractor  can

successfully perform the requirements of the RFQ based on the corporate experience of the written submission." AR 962.  Specifically, offerors were required to address the following:

1) What ongoing strategies have you developed and implemented since the start of the pandemic to support a government agency (federal preferred) in hiring and recruiting initiatives across the country for leadership positions? CONUS and OCONUS locations are preferred.
2) Using specific and verifiable information provide examples within three to five years how your company has led or consulted on a large-scale change to an operating model for involving approximately 15,000 to 17,000 or more full and part-time employees? Federal agency experience is preferred. Describe how you have incorporated change management principles in the development and/or implementation of the new model.
3) Describe your experience in developing readiness metrics for programs without readily available quantifiable information; federal and/or state disaster operations highly desired. What methods (systems and/or processes) did you utilize to provide continuous monitoring and reporting?
4) Using specific and verifiable information provide examples within the last 3 to 5 years of your experience delivering core values and/or cultural change initiatives in field operations for deployed organizations working in high tempo environments.
5) Describe your experience establishing, leading, and planning for devolution (i.e., the transition of activities, roles, and responsibilities, etc.) of Executive Steering Groups or Committees comprised of senior executives (federal Agency experience highly desired).

AR 967–68.

For Factor 2 Oral Presentation, the RFQ stated that offerors would be provided approximately an hour to make their presentations over Zoom, during which the Agency would "assess its confidence that the Contractor can successfully perform the requirements of the RFQ" based on its responses to six Scenario Based Questions, in addition to "on the spot" questions posed by Agency personnel.  AR 963.  Offerors were permitted to submit presentation slides or graphics to FEMA, but the RFQ cautioned offerors that they would not be used for evaluation. AR 964.  The RFQ prohibited offerors from recording the oral presentation and did not provide a guarantee that FEMA would record the oral presentations either.  AR 965.

The RFQ advised that the offerors' Corporate Experience and Oral Presentation would be assessed a "Confidence" rating as follows:

- **High Confidence**: The government has high confidence that the contractor understands the requirement, proposed a sound approach, and will be successful in performing the contract.
- **Some Confidence**: The government has some confidence that the contractor understands the requirement, proposed a sound approach, and will be successful in performing the contract.
- **Low Confidence**: The government has low confidence that the contractor understands the requirement, proposes a sound approach, or will be successful in performing the contract.

AR 966.

With respect to Factor 3 Price, the RFQ initially provided that FEMA would "evaluate the reasonableness of the proposed price." *Id.* It advised that the total price evaluation would be used in the final best value determination and that it "may also evaluate the labor rates to ensure consistency with the Contractor's Schedule contract rates." *Id.* To conduct this evaluation, the RFQ instructed that each offeror "shall submit the information in the provided excel pricing spreadsheet." AR 961. The initial RFQ closed on July 7, 2023. AR 962.

FEMA received 14 timely quotes for Phase I. AR 1565. It selected three offerors to move to Phase II evaluation: Eagle Hill, PotomacWave, and Arc Aspicio, LLC ("Arc Aspicio"). *Id.* On July 26, 2023, FEMA amended the RFQ ("Amendment 2") and provided the following update to the Price Factor evaluation:

**Pricing for Time-and-Materials or Labor-Hour BPAs under FAR Subpart 8.4 (Evaluation).**

The Government will evaluate the reasonableness of the proposed price. To help select the best value Quoter for this BPA opportunity, the Government will use the hourly rates, Column D, from the BPA Labor Category (LCAT) Pricing Rate Worksheet/Excel Spreadsheet. The Government will apply those rates to an estimated number of hours for each labor category. To arrive at a total evaluated price, the total price evaluation for the base and each option year will be used in the

final determination of the best value. The Government may also evaluate the labor rates to ensure consistency with the Contractor's Schedule.

Quoters shall submit the attached pricing worksheet.

AR 1299.  A pricing spreadsheet was attached to the email transmitting the amended RFQ.  *See* AR 1291 (attachment titled "Pricing Format for Contractor.xlsx").  Amendment 2 also contained a set of Questions and Answers ("Q&As"), one of which is particularly relevant to this protest:

> **Question:** The current pricing worksheet does not include plug in hours or the estimated number of personnel. The PWS includes general tasks but does not include specific tasks and deliverables or other information that offerors can use to develop an accurate labor mix. This will encourage offer[or]s to bid unrealistically low levels of effort to reach the lowest price, increasing the Government's risk. Please provide estimated hours, a sample task order, or other scope/workload information to allow offerors to submit a price proposal.
>
> **Answer:** The Government has identified the quantity of personnel for each labor category. Based on the entire PWS, you are to complete the estimated level of effort and labor rates. Each call order will be [its own] separate contract with specific tasks and deliverables under this BPA.

AR 1328–29.

## B.    The Evaluation and Award

On August 22, 2023, FEMA awarded the BPA to PotomacWave.  AR 1444–45.  Eagle Hill filed a bid protest with the Government Accountability Office ("GAO") challenging FEMA's evaluation.  AR 1495–1540.  In response, FEMA agreed to take voluntary corrective action to re-evaluate the quotes and its award decision.  *See Eagle Hill Consulting, LLC*, B-421938.1, Sept. 22, 2023 (unpublished decision) (dismissing protest as academic).

On September 25, 2023, the CO issued another Source Selection Document ("SSD"), in which she again analyzed the proposals submitted by Eagle Hill, PotomacWave, and Arc Aspicio and made a best value determination.  AR 1564–72.   The following is a summary of the findings for each offeror's proposal.

| OPA Program Support and Workforce Development | | | |
|---|---|---|---|
| Offeror | Phase I: Factor 1 – Corporate Experience | Phase II: Factor 2 – Oral Presentation | Phase II: Factor 3 – Price |
| Eagle Hill | High Confidence | High Confidence | $32,478,917.54 |
| PotomacWave | High Confidence | High Confidence | $21,389,617.00 |
| Arc Aspicio | High Confidence | Some Confidence | $31,957,657.88 |
| IGCE | | | $39,418,007.54 |

AR 1571.

As relevant here, the CO provided the following explanation of the Phase I Corporate

Experience proposals from each offeror:

> All Offerors received an overall rating High Confidence recognizing a clear understanding of the requirement, related Corporate Experience, and the number of strengths documented in their proposals. In addition, each Offeror had numerable observed areas that lowered confidence of success, some had a higher count than others. As such, as deeper review was conducted to determine if the areas of concern would result in a low, moderate, or high impact in terms of overall contract success as it related to the PWS. [. . .]

> In reviewing Eagle Hill's response submitted to Corporate Experience, all five elements were addressed providing confidence the Offeror has a clear understanding of the overall requirement as it relates to its Corporate Experience. There were two notable areas of concern that lowered the Government's confidence specific to the questions outlined in the RFQ. For example, in addressing element 2 above in question 3, Eagle Hill described the work but did not describe how it was executed or the methods (systems/processes) it used to provide continuous monitoring and reporting. Second, in addressing element 5 above, Eagle Hill described a clear and organized approach to managing the transition from Design Teams (DT), but DT are not executive groups, specifically outlined in the PWS. Eagle Hill, too, was rated high confidence. However, when reviewing the substance of the concerns that lowered the expectations of success, it wasn't the ranked highest of the three but ranked second of the highest "High Confidence" rating for Corporate Experience which is more important than the other non-price factor.

> Potomac Wave submitted responses to Corporate Experience addressing all five elements outlined above providing confidence the Offeror has a clear understanding of the overall requirement as it relates to its Corporate Experience. There was one area of concern for Potomac Wave as related to element 1, for cultural change experience, the strategies provided were focused on external customers, but federal experience was preferred. Nonetheless, the model addressing this principle's development and implementation was described. Potomac Wave ranked High

Confidence and provided the best overall raised confidence of success in Corporate Experience of the three remaining Offerors.

In conclusion, the RFQ provided the demonstrated Corporate Experience would be evaluated on a rating scale of "high confidence," "some confidence," and "low confidence" representing the Government's confidence in an Offeror's understanding of the requirement.    All three Offerors demonstrated High Confidence in Corporate Experience, with Arc Aspicio and Eagle Hill failing to thoroughly address some of the same elements 2, 3 and 5, with Potomac Wave demonstrating the Highest Confidence of the three based on the overall written evaluated responses.

AR 1566–67.

Also material to this protest is the CO's best-value trade off analysis, which is produced in relevant part below.

All three Offerors demonstrated High Confidence in Corporate Experience, with Arc Aspicio and Eagle Hill failing to thoroughly address some of the same elements 2, 3 and 5, with Potomac Wave demonstrating the Highest Confidence of the three based on the overall written evaluated responses. [. . .]

Eagle Hill and Potomac Wave both received high confidence ratings for Factors 1 and 2. However based on the content of submitted responses to Corporate Experience, Potomac Wave addressing all five elements outlined providing confidence the Offeror has a clear understanding of the overall requirement as it relates to its Corporate Experience. There was one area of concern for PotomacWave as related to element 1, for cultural change experience, the strategies provided were focused on external customers, but federal experience was preferred. Nonetheless, the model addressing this principle's development and implementation was described. Potomac Wave ranked High Confidence and provided the best overall raised confidence of success in Corporate Experience of the three remaining Offerors.

AR 1562–63.

The CO sent offerors post-award notifications on September 25, 2023, again identifying PotomacWave as the successful offeror and notifying the unsuccessful offerors of their right to a post-award debriefing.  AR 1573–80.

**C.      Procedural Background**

1.      The Most Recent GAO Protest

On September 28, 2023, Eagle Hill filed a second protest with the GAO challenging FEMA's re-evaluation and award decision.  *See* AR 1585–1651.  The protest raised objections to FEMA's evaluation of PotomacWave's proposal, claiming that FEMA's evaluation of the Corporate Experience and Price Factors, as well as its best value determination, was flawed.   AR 1593–97.  As relevant to the current protest, Eagle Hill principally alleged that the "Solicitation explicitly required the Agency to conduct a detailed evaluation of each contractor's proposed approach and capability to meet the Agency's requirements," and that for Factor 3 Price, the Solicitation required offerors to submit, and the Agency to evaluate, information for all columns of the pricing spreadsheet including the contractor's "proposed number of personnel and hours by labor category for each of the eleven themes and work areas listed by the Agency."  AR 1593–94.  FEMA requested dismissal of the protest on October 6, 2023.  *See* AR 1652–82.

On October 19, 2023, Eagle Hill filed a supplemental protest with the GAO, adding an additional protest ground alleging that FEMA prevented a "common and equal basis" for competition by including a latent ambiguity in the Solicitation regarding what information from the pricing spreadsheet FEMA would use to evaluate Price.  *See* AR 1706–14.   FEMA requested dismissal of Eagle Hill's supplemental protest on October 20, 2023.  *See* AR 1715–26.

On December 20, 2023, the GAO dismissed Eagle Hill's second and supplemental protests. *See* AR 1733–42.  It held, in relevant part, that Eagle Hill's "interpretation of the solicitation is unreasonable" and because "the allegation [pertaining to Factor 3 Price] is based on the protester's unreasonable view that the solicitation required the agency to evaluate proposed labor hours," Eagle Hill failed to demonstrate that FEMA acted improperly by not evaluating offerors' proposed

labor hours or using those hours to calculate the total evaluated price.  AR 1739.  The GAO also held that the RFQ notified all offerors that offerors' hourly labor rates, but not their labor hours, would be used in the Agency's evaluation.  AR 1740.  Further, to the extent that there was any ambiguity in the Solicitation, the GAO reasoned that such ambiguities were patent and Eagle Hill's post-award challenge to the terms of the RFQ was untimely.  AR 1741–42.  For these reasons, GAO dismissed Eagle Hill's protest.  *Id.*

       2.   <u>The Present Protest</u>

On December 28, 2023, Eagle Hill filed its Complaint in this Court.[2]  *See* Pl.'s Compl., ECF No. 1.   On February 7, 2024, Eagle Hill filed a Motion for Judgment on the Administrative Record ("MJAR").  *See* Pl.'s Mot. for J. on Admin. R., ECF No. 23.  Plaintiff's MJAR contained three exhibits: (1) a declaration from Eagle Hill employee Carlene Hastings ("Hastings Declaration"); (2) a copy of PotomacWave's GSA Schedule; and (3) a declaration from Eagle Hill employee Andy Shuler ("Shuler Declaration").[3]  *See id.* at 46–105.

PotomacWave filed a Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record ("Cross-MJAR").  *See* Def.-Intervenor's Mot. to Dismiss and Cross-Mot. for J. on Admin. R., ECF No. 25.  On March 1, 2024, the Government also filed a Cross-MJAR. *See* Def.'s Cross-Mot. for J. on Admin. R., ECF No. 30.  The parties completed briefing on these dispositive motions on March 15, 2024.  *See* Pl.'s Reply, ECF No. 35; Def.'s Reply, ECF No. 46;

---

[2] Eagle Hill filed a Motion for Leave to Amend its Complaint on March 14, 2024.  Pl.'s Mot. for Leave to Amend at 1, ECF No. 39.  Plaintiff's Amended Complaint incorporated the claims set forth in its dispositive motion.  *Id.*  The Court granted this motion on March 20, 2024. *See* Order at 1, ECF No. 52; *see also* Pl.'s Am. Compl., ECF No. 62.

[3] In accordance with the Court's instruction, Eagle Hill resubmitted the Hastings Declaration and the spreadsheet attached to her declaration as Exhibit B.  Pl.'s Mot. to Amend/Correct Mot. for J. on Admin. R. at 1, ECF No. 51; *see* Order, ECF No. 52 (granting motion).

Def.-Intervenor's Reply, ECF No. 40.  The Court held oral argument on the parties' cross-motions on March 25, 2024.

The parties also filed various motions related to the scope and content of the Administrative Record.  On February 27, 2024, the Government filed an Unopposed Motion to Complete the Administrative Record with various documents from the GAO proceedings that were inadvertently omitted from the record, which the Court subsequently granted.  Def.'s Unopposed Mot. to Correct the Admin. R. at 1, ECF No. 26; *see also* Def.'s Notice of Filing, ECF No. 34.

On March 1, 2024, the Government filed a Motion to Strike requesting, as a procedural matter, that the Court strike the entirety of the Hastings Declaration and strike paragraphs 8–12 of the Shuler Declaration from Eagle Hill's MJAR.  Def.'s Mot. to Strike at 1, ECF No. 28.  Eagle Hill opposed the Government's Motion to Strike, and in the alternative, filed the same exhibits with a Motion to Supplement the Administrative Record.[4]  *See* Pl.'s Resp. to Mot. to Strike, ECF No. 42; Pl.'s Mot. to Suppl. Admin. R., ECF No. 43.  These motions are now fully briefed.  *See* Def.-Intervenor's Resp. to Pl.'s Mot. to Suppl. Admin. R., ECF No. 56; Def.'s Opp'n in Part to Pl.'s Mot. to Suppl. Admin. R., ECF No. 57; Pl.'s Reply, ECF No. 61.

The Government also filed a Motion to Supplement the Administrative Record with the declaration of Armetia Cato ("First Cato Declaration"), the CO for the Solicitation at issue.  Def.'s Mot. to Suppl. R. at 1, ECF No. 29.  The First Cato Declaration addresses the "misplacement of a spreadsheet in the [A]dministrative [R]ecord[,]" and the lack of a discussion of the services listed on PotomacWave's GSA schedule—both issues which the Court addresses below.  *Id.* at 2; *see also infra* §§ III(A)(1), III(B).  Eagle Hill partially opposed this Motion, arguing that paragraphs

---

[4] Since overlapping arguments are raised in the briefing on Plaintiff's Motion to Supplement, which cured the procedural defect raised by the Government in its request to strike the exhibits, the Court denies the Government's Motion to Strike as moot.

4 and 5 of the declaration are vague and conclusory.  *See* Pl.'s Partial Obj. to Def.'s Mot. to Suppl., ECF No. 44.

On March 3, 2024, in response to the Government's filing of the First Cato Declaration, Eagle Hill filed a Motion for Discovery concerning the spreadsheets inadvertently included in the Administrative Record.  Pl.'s Mot. to Compel Disc. at 1–2, ECF No. 31.  The Government and Defendant-Intervenor opposed Plaintiff's Motion.  *See* Def.'s Opp'n to Pl.'s Mot. to Compel Disc. at 1, ECF No. 36; Def.-Intervenor's Resp. to Pl.'s Disc. Mot. at 2, ECF No. 37; Pl.'s Reply, ECF No. 41.  The Court held oral argument on Eagle Hill's Motion to Compel Discovery on March 18, 2024, and subsequently denied the motion.  Order at 1, ECF No. 52.

Following oral argument, the Government filed a second Motion to Supplement the Administrative Record with another declaration from Ms. Cato ("Second Cato Declaration").  *See* Def.'s Mot. to Suppl. Admin. R., ECF No. 50; Ex. 1 to Def.'s Mot. to Suppl. Admin. R., ECF No. 50-1.  The Court granted the Government's second Motion to Supplement on March 20, 2024.[5] ECF No. 52 at 1.

## II.  LEGAL STANDARDS

### A.    Motions to Dismiss

Under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), dismissal at the pleadings stage "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  In resolving a Rule 12(b)(6) motion, the Court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences

---

[5] In accordance with the Court's instruction, the Government resubmitted the Second Cato Declaration on March 21, 2024, to correct a misstatement in the first declaration.  *See* Def.'s Notice of Filing, ECF No. 55.

in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

### B.     Motions for Judgment on the Administrative Record

Rule 52.1(c) governs motions for judgment on the administrative record. Such motions are "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

### C.     Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act. *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*,

365 F.3d 1345, 1350 (Fed. Cir. 2004).   Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).   To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").   A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).   An "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332

In reviewing an agency's procurement decisions, the Court may not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations").   The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the

14

contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In a bid protest, the Court reviews questions of law de novo.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The interpretation of a solicitation or of procurement regulations presents such questions.  *See id.*; *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986).  The Court of Federal Claims does not afford deference on questions of law.  *See VS2, LLC v. United States*, 155 Fed. Cl. 738, 767 (2021).

### D.    Standing in a Bid Protest

To establish standing in a bid protest, the plaintiff is required to demonstrate that it is an interested party, meaning it "is an actual or prospective bidder[ ] and . . . possesses the requisite direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  To show a "direct economic interest," the plaintiff must show that it was prejudiced by the Government's alleged errors by proving it had a "substantial chance" of receiving the contract. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002).  Put differently, a plaintiff has standing to pursue a bid protest if it demonstrates that "but for the error[s]" challenged in the protest it "would have had a substantial chance of securing" the contract at issue.  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval*, 175 F.3d at 1367.

In *CACI, Inc.-Federal v. United States*, the Federal Circuit held that § 1491(b)(1)'s interested party requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction.  67 F.4th 1145, 1151 (Fed. Cir. 2023).  According to *CACI*, the Court may thus choose—but is not required—to make an initial, "preliminary determination

('substantial chance') with respect to the plaintiff's chances of securing the contract" before addressing the merits. *Id.* at 1152. As the Circuit further observed, the statutory standing issue and the merits issue may be overlapping, especially where the plaintiff's protest challenges the agency's evaluation of its own bid. *Id.* at 1152–53 (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012)).

### E.   *Blue & Gold* Waiver

Where a bid protest involves a challenge to the terms of a solicitation, protestors must assert a timely objection to avoid waiver. Under *Blue & Gold Fleet v. United States*, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 491 F.3d 1308, 1313 (Fed. Cir. 2007). The waiver rule furthers the statutory mandate in 28 U.S.C. § 1491(b)(3), which provides that "'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*.'" *Id.* (emphasis in original) (quoting 28 U.S.C. § 1491(b)(3)).

In this way, the "waiver rule . . . prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *Id.* at 1314. Without a waiver rule, a contractor could discover a defect in a solicitation, remain silent, and submit its first proposal. *Id.* If the first proposal is not selected for award, "the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors." *Id.*; *see also COMINT Sys.*, 700 F.3d at 1382 (holding "the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so").

Courts have held that when *Blue & Gold*'s waiver rule applies, a court must dismiss the action; it has no discretion to allow the plaintiff to maintain its protest. *See, e.g.*, *Contract Servs., Inc. v. United States*, 104 Fed. Cl. 261, 273 (2012); *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 139 (2009). The Court considers the issue of waiver under the RCFC 12(b)(6) standard. *See, e.g.*, *SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 751–52 (2021), *overturned on other grounds*, 34 F.4th 1063, 1073–74 (Fed. Cir. 2022); *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 95 (2021).

## III. DISCUSSION

Eagle Hill challenges FEMA's award to PotomacWave on four grounds. It alleges that: (1) the Solicitation included a latent ambiguity regarding the Factor 3 Price spreadsheet and a latent ambiguity regarding how the Agency intended to evaluate Factor 3 Price proposals; (2) PotomacWave was ineligible for award; (3) FEMA's evaluation of Corporate Experience was arbitrary and capricious; and (4) FEMA failed to adequately document its evaluation. The Court addresses each argument in turn.

**A.     The Solicitation Did Not Contain a Latent Ambiguity Regarding an Erroneous Price Spreadsheet, But It Did Include a Patent Ambiguity Regarding the Content of the Price Proposal Which Eagle Hill Failed to Timely Challenge.**

Eagle Hill argues that the Solicitation included a latent ambiguity regarding the pricing spreadsheet that each offeror was required to complete as part of its Factor 3 Price proposal. ECF No. 23 at 20–23. As explained below, Eagle Hill's argument relies on the Agency's erroneous inclusion in the Administrative Record of an internal evaluation spreadsheet containing estimated labor hours where the Factor 3 pricing spreadsheet attached to Amendment 2 should have been. *Id.* at 20. Assuming this was not an error, Eagle Hill asserts that FEMA intended to provide offerors with a different pricing spreadsheet than the one it actually provided and evaluated. *Id.* at

21, 23.  Additionally, Eagle Hill argues that FEMA's evaluation of its proposal under Factor 3 Price was contrary to the terms of Solicitation or, in the alternative, that the description of the evaluation contained a latent defect.  *Id.* at 22–27.  A proper evaluation, Eagle Hill argues, would have considered the offerors' hourly rates *in addition to* the information included in the other columns of the spreadsheet.  *Id.* at 25.  Only by considering the full spreadsheet could FEMA appropriately evaluate both total price *and* the offerors' approach and capability, as Eagle Hill claims the RFQ required.  *Id.* at 25–26.  Eagle Hill argues that such an evaluation would have resulted in a higher rating for its Factor 3 Price proposal and made PotomacWave's proposal ineligible for award (since PotomacWave only completed the hourly rate column of the spreadsheet).  *Id.* at 23–27.

The Government and PotomacWave disagree, arguing that the pricing spreadsheet actually sent to offerors was the only version of the document the Agency ever intended to provide.  ECF No. 25 at 20; ECF No. 30 at 19.  Thus, following Amendment 2, which plainly informed offerors that the Agency would perform its Factor 3 price evaluation by applying an offeror's proposed hourly rates to the Agency's "estimated number of hours for each labor category[,]" offerors only needed to complete the hourly rates column of the pricing spreadsheet. ECF No. 25 at 18 (citing AR 1291); ECF No. 30 at 20.  In the alternative, the Government and PotomacWave argue that, at best, Eagle Hill has identified a patent ambiguity apparent on the face of the RFQ, which Eagle Hill should have raised prior to the close of bidding or award.  ECF No. 25 at 16–21; ECF No. 30 at 19–22; *see Blue & Gold*, 492 F.3d at 1313; *see also COMINT Sys.*, 700 F.3d at 1382.  Eagle Hill has failed to meet its burden on either ground.

1.    Eagle Hill's Latent Ambiguity Argument with Respect to the Erroneous
      Spreadsheet Is Without Merit.

Eagle Hill's first latent ambiguity argument raises a threshold question about the accuracy of the Administrative Record with regard to the pricing spreadsheet that the Solicitation required offerors to complete as part of the Agency's Factor 3 Price evaluation.  This issue is also addressed in the parties' motions to supplement the Administrative Record, and as such, the Court will resolve the arguments contemporaneously.

When reviewing agency action under § 706 of the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp*, 411 U.S. at 142; *see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record[,]" in "recognition that further judicial inquiry into 'executive motivation' represents a 'substantial intrusion' into the workings of another branch of Government and should normally be avoided.") (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)).  As such, the Federal Circuit has explained that the administrative record in a bid protest "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA."  *Axiom v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

Courts have found supplementation appropriate under this standard where the supplemental material is "necessary to help explain an agency's decision . . . , particularly when a subjective value judgment has been made but not explained," *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004) (citing *Camp*, 411 U.S. at 142–43); helps explain what the contracting officer reviewed and considered in reaching his or her decision, *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 747 (2006), *aff'd*, 228 F. App'x 980 (Fed. Cir. 2007); or "correct[s]

mistakes and fill[s] gaps" in the administrative record, *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 131 (2018) (citing *Axiom*, 564 F.3d at 1379–81).

When the Government first filed the Administrative Record, it included a spreadsheet titled "FOD/OPA Program Support and Workforce Development – Pricing Template" ("Initial RFQ Spreadsheet") in the place where the pricing spreadsheet initially sent out with the RFQ should have been.  AR 1006–17.  This Initial RFQ Spreadsheet, which contained 11 preset labor categories, as well as columns for each offeror's proposed hourly rates (Column D), hours per week (Column E), and number of weeks (Column F), also contained a prefilled column for number of personnel (Column C).  AR 1006.  Separately, the Administrative Record also included a spreadsheet with the same title in the place where the pricing spreadsheet sent out with Amendment 2 should have been ("Initial Amendment 2 Spreadsheet").  AR 1317–27.  The Initial Amendment 2 Spreadsheet also contained 11 preset labor categories, columns for hourly rates (Column D), number of personnel (Column C), and number of weeks (Column F), but the hours per week column (Column E) was prefilled.  AR 1317.

The record shows that these were not the pricing spreadsheets that the offerors received from the Agency and used when submitting proposals.  Each of the proposals submitted by the offerors included a pricing spreadsheet that contained the same 11 preset labor categories and the same columns for each offeror's proposed hourly rates (Column D), number of weeks (Column F), number of personnel (Column C), and hours per week (Column E), but neither Column C nor Column E were prefilled.  AR 1350–59 (Arc Aspicio), 1371–80 (Eagle Hill), 1383–92 (PotomacWave).  Herein lied a major discrepancy: based on the Administrative Record filed by

the Government, it appeared that FEMA sent offerors a version of the spreadsheet that was not actually sent.[6]

Eagle Hill identified this discrepancy in its MJAR and attached to its brief the Hastings Declaration.  ECF No. 51 at 4.  Ms. Hastings, a director at Eagle Hill familiar with the Solicitation and Eagle Hill's proposal, averred that the spreadsheet included in the Administrative Record as having been provided to offerors was not the pricing spreadsheet provided during the procurement. *Id.*; *see also* ECF No. 23 at 20.  Seizing on this discrepancy, Eagle Hill argues that the spreadsheet in the record was the spreadsheet the Agency *intended* to provide, not the spreadsheet it actually provided and evaluated—a mistake that introduced a latent ambiguity into the RFQ.  *Id.*

In response, the Government concedes that it committed an error in preparing the Administrative Record.  *See* ECF No. 29 at 2.  Through a sworn declaration from the CO, Ms. Cato, the Government explains that it inadvertently produced a document in the wrong section of the Administrative Record.  *Id.*; Attach. to Def.'s Mot. to Suppl. R. at 1, ECF No. 29-1 (First Cato Decl. ¶ 3).  Specifically, the CO averred that the Initial Amendment 2 Spreadsheet produced by the Government was an internal evaluation spreadsheet that "was not produced to offerors and was not intended to be produced to offerors."  ECF No. 29-1 at 1 (First Cato Decl. ¶ 3).  Rather, it included "the internal estimate of hours that FEMA used to calculate price for the Factor 3: Price evaluation" and should have been included in the evaluation section of the record.  *Id.*  In the Second Cato Declaration, the CO further clarified that the Initial RFQ Spreadsheet was "an internal spreadsheet that was used by the program office in creating the IGCE," and it was likewise "not produced to Offerors."  ECF No. 50-1 at 2 (Second Cato Decl. ¶ 6).  The Government further

---

[6] Though the offerors' actual pricing spreadsheets also varied from the Initial RFQ Spreadsheet, Eagle Hill did not raise this discrepancy in its MJAR.  *Compare* AR 1006–17 *with* AR 1350–59 (Arc Aspicio), 1371–80 (Eagle Hill), 1383–92 (PotomacWave).

represents that a *single version* of a different document, a pricing spreadsheet with no prefilled columns, should have been placed in the record where the two erroneous spreadsheets were included.  *See* ECF No. 29 at 2; ECF No. 50 at 2.

This position aligns with the Agency's earlier representation to the GAO, where the GAO asked FEMA to confirm whether it issued an updated pricing spreadsheet as part of Amendment 2.  AR 1702.  FEMA affirmatively represented that it did not issue a new pricing spreadsheet:

> **GAO Request:**  GAO requests the agency confirm that the pricing spreadsheet provided by the protester (*See* EPDS Dkt. 1) is the version of the spreadsheet used by the agency during the evaluation of quotations.  That is, were there any changes to the spreadsheet included as part of amendment 2 to the RFQ?  If there were changes to the spreadsheet, please provide the relevant version.

> **FEMA Response:** No new spreadsheet was issued with Amendment 2.

AR 1702–03.

Additionally, that FEMA prepared internal estimates for purposes of its evaluation, rather than for use by the offerors in their proposals, is consistent with the RFQ's evaluation criteria.  As explained in the Solicitation, the Agency intended to evaluate price by applying the hourly rates provided in each offeror's spreadsheet "to an estimated number of hours for each labor category." AR 1299.  The Q&As also advised offerors that FEMA had "identified the quantity of personnel for each labor category."  AR 1328.  These estimates appear to be reflected in the Initial Amendment 2 Spreadsheet and Initial RFQ Spreadsheet, respectively.  *See* AR 1006, 1317.

Overall, the Government's explanation of these spreadsheets as being erroneously included in the Administrative Record is both consistent with the Agency's representation to the GAO, the CO's representations to this Court, and the record as a whole.  Moreover, the presumption of regularity supports the Government's position.  The presumption "provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged

their official duties." *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed. Cir. 2004).  Here, the Court is persuaded that FEMA intended to issue with the Solicitation (including Amendment 2) a single version of the pricing spreadsheet that did not include prefilled labor hours, and that this single version was completed by the offerors and used by the Agency during evaluation.  Eagle Hill has not presented any evidence, let alone "clear evidence," that the Agency did not do as it intended and instead issued, evaluated, and based its award decision on the wrong pricing spreadsheet.

Since this finding necessarily relies on the declarations of Ms. Hastings and Ms. Cato, the Court grants in part Plaintiff's Motion to Supplement the Administrative Record with the Hastings Declaration and grants the Government's Motion to Supplement the Administrative Record with the First Cato Declaration.

2.  <u>The Solicitation Did Not Contain a Latent Ambiguity Regarding the Agency's Price Evaluation, But It Did Contain a Patent Ambiguity with Respect to the Content of the Pricing Proposal.</u>

Eagle Hill's second latent ambiguity claim, which it raises in the alternative, pertains to how the Agency intended to evaluate Factor 3 Price and what information the offerors were required to provide in the pricing spreadsheet.  ECF No. 23 at 22.  Eagle Hill contends that, in addition to the price reasonableness analysis required by the Solicitation, the Agency was required to conduct an evaluation of each offeror's "approach and capability" under Factor 3 Price.  *Id.* at 22–24.  The language Eagle Hill relies upon to support this challenge comes from the "Quote Organization" portion of the Solicitation, which states: "[t]he Government will conduct a detailed evaluation of each Contractor's approach and capability to meet the Government's requirement against the following evaluation factors[.]"  AR 1294 (providing a table showing the evaluation phases, factors, and page or format limits).  Read in that way, Eagle Hill argues that the Solicitation required offerors to submit, and the Agency to evaluate, information for all columns of the pricing

spreadsheet; in addition, the Agency's price evaluation would apply each offeror's proposed hourly rate to the Agency's labor hours estimate.  ECF No. 23at 24–25.

In response, the Government and PotomacWave argue that the Solicitation's evaluation criteria did not require a separate "approach and capability" evaluation for Factor 3 Price.  ECF No. 30 at 20; ECF No. 25 at 21–22.  Instead, they assert that the Solicitation *only* required FEMA to "evaluate the reasonableness of the proposed price" by using the "hourly rates, Column D, from the BPA Labor Category (LCAT) Pricing Rate Worksheet/Excel Spreadsheet" and "apply[ing] those rates to an estimated number of hours for each labor category."  ECF No. 24 at 21–22 (citing AR 1299).  According to that reading, the Solicitation plainly informed offerors to insert *only* their hourly labor rates into the pricing spreadsheet.  ECF No. 25 at 18 (citing AR 1291); ECF No. 30 at 20.  Since the Solicitation's evaluation criteria did not require an "approach and capability" analysis for Factor 3 Price, the Government and PotomacWave argue that Eagle Hill was required to challenge the terms of the Solicitation prior to submitting its proposal if it wished for the Agency to conduct that type of analysis.  ECF No. 30 at 20; ECF No. 40 at 11.

Eagle Hill's claim involves an interpretation of the RFQ's terms and as such presents a question of law.  *Banknote Corp. of Am.*, 365 F.3d at 1353.  The principles governing contract interpretation apply with equal force when the Court is tasked with interpreting a solicitation.  *Id.* at 1353 n.4 (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed Cir. 1996)); *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021).  Thus, the Court must begin with the plain language of the document.  *Banknote Corp. of Am.*, 365 F.3d at 1353; *see Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  If the RFQ's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning."  *McAbee Constr.,*

*Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting *Ala. Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).  The terms of the solicitation are "ambiguous only if [the] language is susceptible to more than one reasonable interpretation." *Banknote Corp. of Am.*, 365 F.3d at 1353.  In determining the meaning of a solicitation's terms, the Court is guided by the principle that an "interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NVT Techs.*, 370 F.3d at 1159.

On the question of the type of analysis FEMA was required to conduct under the Factor 3 Price evaluation, there is no ambiguity.  The two-part analysis that Eagle Hill proffers relies on language that generally summarized FEMA's overall evaluation in the context of instructing offerors on how to organize their quotes.  AR 1294.  In contrast, the "Evaluation Criteria" section of Amendment 2 specifically described what the Agency would analyze under each factor, including "Phase II – Factor 3: Price."  AR 1295–1300.  The Solicitation clearly stated that a price reasonableness analysis would be performed, but it did not state that Factor 3 Price would be evaluated for "approach and capability."[7]  AR 1299.  Rather, to determine reasonableness, the Agency would apply the offerors' proposed rates to the Agency's estimated number of hours for each labor category.  AR 1299.  To the extent there is some conflict between the "Quote

---

[7] Notably, where the criteria for an evaluation factor (*i.e.*, Factors 1 and 2) was aimed at analyzing approach and capability, the RFQ clearly stated as much.  *See* AR 1295 ("The Government will assess its level of confidence that the Contractor can successfully perform the requirements of the RFQ based on the corporate experience written submission."), 1296 ("The Government will assess its confidence that the Contractor can successfully perform the requirements of the RFQ based on its presentation responding to the following Scenario Based Questions.").  This also was reflected in the qualitative ratings to be assigned for Factors 1 and 2, which assessed FEMA's "confidence that the contractor understands the requirement, proposes a sound approach, and will be successful in performing the contract."  AR 1299.

Organization" section of the RFQ and the Factor 3 evaluation criteria, the particular terms related to the price reasonableness analysis control over the more generalized language of the instructions, and Eagle Hill's attempt to impose an independent "approach and capability" analysis into the evaluation criteria listed for Factor 3 Price is unpersuasive.[8] *Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 792 (2008) (holding that where the "specific and general terms in [the RFQ] are in conflict, those which relate to a particular matter control over the more general language" (quoting *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992))).

On the question of the information that offerors were supposed to submit for Factor 3 Price, Amendment 2 is ambiguous. To trace the ambiguity, one must start with the original RFQ language and pricing spreadsheet. The RFQ initially stated that FEMA would "evaluate the reasonableness of the proposed price," using the total price evaluation in the best value determination. AR 989. The RFQ required offerors to submit their price proposals in an Excel pricing spreadsheet that was provided with the Solicitation. AR 961. The pricing spreadsheet included, among other pricing information, the 11 labor categories required by the Solicitation. *See* AR 1746–49. For each labor category, the spreadsheet included columns for offerors to propose the number of personnel for the labor category, the number of labor hours, hourly labor rates, and number of weeks. *Id.* These columns were highlighted in blue. *Id.* The total cost for each labor category would be the product of the hourly labor rate proposed and the number of labor hours. *Id.*; *see* Oral Arg. Tr. at 8:6–9:7, ECF No. 60. It appears there is no dispute that, as

---

[8] Since a plain language reading of the RFQ demonstrates that Eagle Hill's interpretation of the Factor 3 Price evaluation is not reasonable, the Court need not consider whether Eagle Hill's argument is waived under *Blue & Gold*. The Court also need not consider paragraphs 8–12 of the Shuler Declaration, which address Eagle Hill's interpretation of the Solicitation. As such, Eagle Hill's Motion to Supplement is denied to that extent.

contemplated by the original evaluation criteria, the offerors were expected to complete the entire spreadsheet.

When the Agency issued Amendment 2, it made a significant revision to the Factor 3 evaluation language by providing additional information on how it would evaluate quotes. It specified that FEMA would "use the hourly rates, Column D, from the BPA Labor Category (LCAT) Pricing Rate Worksheet/Excel Spreadsheet" and would "apply those rates to an estimated number of hours for each labor category." AR 1299. The revision also expressly directed offerors to "submit the attached pricing worksheet." *Id.* But the Agency did not make any changes to the pricing spreadsheet as part of Amendment 2 and, as such, the spreadsheet still contained blue-highlighted columns for number of personnel, labor hours, hourly labor rates, and number of weeks, in addition to total cost. *See* AR 1746–49. In conjunction with the additional description of the evaluation criteria offered with Amendment 2, the Q&As also addressed the pricing spreadsheet. AR 1328. Q&A No. 7 advised offerors that FEMA had "identified the quantity of personnel for each labor category" and directed them "to complete the estimated level of effort and labor rates." AR 1328 (emphasis added). Upon submission of its proposal, Eagle Hill filled in all the blue-highlighted columns, which in turn automatically generated a total cost estimate, while PotomacWave and Arc Aspicio only filled in the hourly rate column (Column D). *See* AR 1350–59 (Arc Aspicio), 1371–80 (Eagle Hill), 1383–92 (PotomacWave).

Each side's interpretation of the pricing spreadsheet is internally consistent with how they expected the price evaluation to be conducted. However, each side's interpretation of the pricing spreadsheet is also inconsistent with other terms of the Solicitation. As Eagle Hill points out, while Amendment 2 provided more specificity with regard to the Agency's price reasonableness analysis, the Agency did not delete any of the other columns from the attached pricing spreadsheet.

ECF No. 23 at 26.  Why, Eagle Hill argues, would the Agency keep those columns, along with the instructions that each "contractor shall submit the information in the provided excel pricing spreadsheet," with the expectation that some of the columns should go unfilled?  *Id.* at 24–25 (citing AR 1294).  Eagle Hill also points to the fact that in Q&A No. 7, the Agency specifically instructed offerors "to complete the estimated *level of effort* and labor rates[.]"  AR 1328 (emphasis added).  Since level of effort could reasonably refer to the number of personnel and labor hours for each labor category, this reference ("level of effort and labor rates") could reasonably refer to all the blue-highlighted columns.  ECF No. 23 at 24–25.

On the other hand, PotomacWave correctly notes that Amendment 2's revised criteria specifically advised that FEMA would conduct the price evaluation using its own estimate of labor hours, so necessarily the only relevant input from offerors for purposes of the evaluation would be their proposed labor rates.  ECF No. 25 at 19–20.  PotomacWave also points out that the Agency's answer to Q&A No. 7 stated that "[t]he Government has identified the quantity of personnel for each labor category[,]" which (read in conjunction with the evaluation criteria) undermines the contention that it wanted offerors to propose number of personnel and the associated number of labor hours.  *See id.* at 21–22 (citing AR 1328).  According to PotomacWave, the level of effort referred to in the Q&A could mean, in this context, proposing labor rates for the particular labor categories an offeror believed were needed to meet the requirements.  ECF No. 60 at 84:16–85:5.  The only conclusion to be drawn is that what the Solicitation required offerors to complete in the pricing spreadsheet was ambiguous.

All the facts material to the finding of ambiguity also demonstrate that the ambiguity was patent.  Just as whether a solicitation provision was ambiguous is a question of law for the Court, so too is the question of whether an ambiguity was patent or latent.  *NVT Techs.*, 370 F.3d at 1159–

62 (setting forth a two-part analysis: (1) "whether the solicitation supports only one reading or supports more than one reading and is ambiguous," and (2) "whether the ambiguity was patent"). A patent ambiguity is present where there are facially inconsistent provisions that would "place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)); *see NVT Techs.*, 370 F.3d at 1162 ("A patent ambiguity is one that is "'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" (quoting *H & M Moving, Inc. v. United States*, 204 Ct. Cl. 696 (1974))). A latent ambiguity is hidden or concealed, not apparent on the face of the document, could not be discovered by "reasonable and customary care[,] and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Per Aarsleff*, 829 F.3d at 1312 (quoting *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997)). As noted above, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest in the Court of Federal Claims." *Blue & Gold*, 492 F.3d at 1313; *see COMINT Sys.*, 700 F.3d at 1382.

Here, the ambiguity about what information offerors should submit in the pricing worksheet was not hidden or concealed. Indeed, the inconsistency between what information the Agency would evaluate and what information the offerors should provide in their proposals was glaring. This is best exemplified in Amendment 2's revised evaluation criteria, which advised offerors that the Agency would apply its estimated labor hours to the offerors' proposed labor rates in Column D of the pricing spreadsheet, but at the same time instructed offerors to submit the

pricing spreadsheet from the original RFQ, which included numerous columns for offerors to provide information beyond just labor rates.  It also is exemplified in Q&A No. 7, which on one hand advised offerors that the Agency had its own estimate for personnel quantity but on the other instructed offers to provide an estimated level of effort, in addition to labor rates.  These discrepancies should have put Eagle Hill on notice, triggering a duty to raise the issue with FEMA to resolve the inconsistencies.[9]  *See Per Aarsleff*, 829 F.3d at 1312.

Since Eagle Hill did not seek clarification before it submitted its proposal or before FEMA made an award, its challenge is thus waived and must be dismissed.  *See Blue & Gold*, 492 F.3d at 1313.[10]

## B.    PotomacWave Was Eligible for Award.

Eagle Hill asserts that PotomacWave was ineligible for award because PotomacWave did not provide the required labor categories from its GSA Multiple Award Schedule contract for SLIN 541611, Management and Financial Consulting, Acquisition and Grants Management Support, and Business Program and Project Management Services pursuant to FAR Subpart 8.4.  ECF No.

---

[9]  At least one offeror sought clarification from FEMA about the pricing spreadsheet in connection with Amendment 2.  AR 1328–29; *see Quanterion Sols., Inc. v. United States*, 152 Fed. Cl. 434, 445 (2021) ("An ambiguity in [a Request for Proposals] is generally patent if offerors seek clarification of the ambiguous provision prior to submitting their proposals.");  *Per Aarsleff*, 829 F.3d at 1312 ("[T]he ambiguity in the solicitation was patent, as reflected in the questions received by the Air Force and the two plausible interpretations indicated above."); *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 575–77 (2021) (finding an ambiguity to be patent in a situation in which an ambiguity was identified during Q&A but not clarified and finding a challenge in that case to be waived).

[10]  Eagle Hill separately argues that the Solicitation was so poorly drafted that no offeror could compete on a common and equal basis for competition.  ECF No. 23 at 31–33.  Since this allegation derives from the same issue, *i.e.*, whether the Solicitation was patently ambiguous with regard to what offerors were required to fill out in the pricing spreadsheet, this protest ground is also waived.  *See Blue & Gold*, 492 F.3d at 1313.

23 at 27–29 (citing AR 1293).  GSA Schedule contracts—such as the one at issue—require all schedule contractors to publish an "Authorized Federal Supply Schedule Pricelist."[11]  FAR 8.402(b).  These pricelists must contain all supplies and services offered by a schedule contractor. *Id.*  Eagle Hill contends that since PotomacWave did not provide the required GSA labor categories, its proposal failed to conform to the material terms and conditions of the Solicitation and should be considered unacceptable.  ECF No. 23 at 27 (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)); *see id.* at 29.

This protest ground likewise raises an issue with the completeness of the Administrative Record as initially filed by the Government.  While PotomacWave's Factor 3 pricing spreadsheet included labor rates for the SLIN 541611 pricelist, AR 1383–92, and FEMA's price analysis stated that the Agency substantiated each offeror's proposed costs by reviewing the proposal and "other information pertinent to ascertain the most accurate analysis[,]" AR 1569, a copy of PotomacWave's GSA Schedule was not included in the Administrative Record.  The First Cato Declaration clarified why there was no analysis of PotomacWave's labor categories in the Agency's evaluation.  The CO explained:

> Due to the significant and clear overlap in duties between the Solicitation LCATs and the LCATs provided by Potomac Wave Consulting, no additional analysis was necessary to determine that PWC's proposal was responsive and in accordance with the Solicitation.
>
> While the Arc and Eagle Hill proposals both included an explicit crosswalk connecting the Solicitation LCATs with the proposal LCATs, such analysis was similarly unnecessary and both proposals would have been evaluated the same without such documentation.

---

[11] The Federal Supply Schedule program, directed and managed by GSA, gives federal agencies a simplified process for obtaining commonly used commercial supplies and services. *See* FAR 8.402(a).

ECF No. 29-1 at 2 (First Cato Decl. ¶¶ 4, 5).  This explanation did not state how the CO determined the "clear overlap," *id.* (First Cato Decl. ¶ 4), but the Government eventually conceded that the CO reviewed a copy of PotomacWave's GSA Schedule, which is publicly available, and thus the document should be included in the Administrative Record.[12]   ECF No. 60 at 73:12–20.

Since the CO did review PotomacWave's GSA Schedule, Eagle Hill's allegation boils down to its belief that the CO could not confirm that PotomacWave has the requisite labor categories on its GSA Schedule without PotomacWave providing a crosswalk.  ECF No. 23 at 29.  But Eagle Hill did not (and indeed, cannot) identify any provision of the Solicitation requiring a labor category crosswalk.  *See* AR 1293–1300.   Moreover, PotomacWave's GSA Schedule provides detailed information about each of its labor categories, including functional responsibilities, experience, education, and certification requirements, from which the CO could determine the overlap in duties.  *See* ECF No. 43 at 51–70.  As such, PotomacWave's proposal adhered to the Solicitation requirements in this regard and Eagle Hill has provided no basis for determining otherwise.

**C.**  **FEMA's Evaluation of Factor 1 Corporate Experience Was Not Arbitrary and Capricious.**

Eagle Hill challenges FEMA's evaluation of Factor 1 Corporate Experience on three grounds.  It alleges: (1) Eagle Hill should have been the highest ranked offeror for the Corporate Experience Factor; (2) FEMA's evaluation arbitrarily disregarded the bases that increased its expectations of success in an offeror; and (3) PotomacWave failed to provide relevant and

---

[12] The Court therefore grants in part Plaintiff's Motion to Supplement the Administrative Record with PotomacWave's GSA Schedule Contract but does so on the ground that it is properly part of the Administrative Record and is needed to complete the record.

verifiable past performance information.  Eagle Hill's argument is unavailing on all grounds, as FEMA rationally evaluated the offerors' proposals.

Eagle Hill first argues that FEMA's ranking of Eagle Hill as second highest for the Corporate Experience Factor is undercut by the Agency's own on-the-spot Consensus Evaluation Report ("Experience Evaluation Repot") of Eagle Hill's Corporate Experience proposal.  ECF No. 23 at 33 (citing AR 1228–31, 1567).  Eagle Hill contends that it should have been the highest ranked offeror under this factor because FEMA identified 18 aspects of Eagle Hill's proposal that increased the Agency's "expectations of success" in Eagle Hill's ability to perform the contract, whereas FEMA identified only four areas in PotomacWave's proposal that increased FEMA's confidence in its proposal.  *Id.* at 33–34 (citing AR 1228–31, 1243).  Eagle Hill also contends that FEMA did not identify any counterweights that would substantially lower the Agency's assessment, though FEMA did identify two bases in Eagle Hill's proposal and one basis in PotomacWave's proposal that potentially lowered the Agency's expectations of success.  *Id.* at 34 (citing AR 1228–31, 1243–44).  Thus, "in balancing the increases against the decreases," Eagle Hill argues that its 16 net bases for increasing the Agency's expectations of success compared to the three net bases for PotomacWave indicate that Eagle Hill should have been the highest ranked offeror for Corporate Experience.  *Id.*

The Court declines to substitute its judgment for that of the Agency and re-score the offerors' proposals.  *See E.W. Bliss Co.*, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government").  In a FAR Part 8 procurement, a CO is required only to "'provide[] a coherent and reasonable explanation' of the strengths and weaknesses of the individual quotes based on the RFQ's factors."  *Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 550 (2022) (citing *Distrib. Sols., Inc.*

*v. United States*, 106 Fed. Cl. 1, 24 (2012), *aff'd*, 500 F. App'x 995 (Fed. Cir. 2013)); *see also* FAR Subpart 8.4.  The CO did exactly that, explaining that "[a]ll three offerors demonstrated High Confidence, with Arc Aspicio and Eagle Hill failing to thoroughly address some of the same elements, 2, 3, and 5, with Potomac Wave demonstrating the Highest Confidence of the three based on the overall written evaluated responses."  AR 1558.  Even though Eagle Hill was awarded a significant number of positive indicators of success as compared to its negative indicators, "a simple comparison of the number of strengths or weaknesses identified in each proposal cannot reasonably serve as a basis for determining their . . . relative value." *McConnell Jones & Murphy LLP v. United States*, 128 Fed. Cl. 218, 230 (2016).  The Court will not require the CO to provide greater rationale than what is required by law and, in doing so, second guess its discretionary determination.  *See E.W. Bliss Co.*, 77 F.3d at 449 (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993)).

In a second attack on the Agency's evaluation of Corporate Experience, Eagle Hill contends that FEMA arbitrarily disregarded the bases that increased its expectations of success in an offeror.  ECF No. 23 at 34–36.  Eagle Hill asserts that despite the numerous aspects of Eagle Hill's proposal that increased the Agency's "expectations of success," the CO glossed over the significant positive indicators identified in Eagle Hill's proposal.  *Id.* at 35.  Eagle Hill further asserts that the CO only weighed the aspects of each offerors' proposal that lowered the Agency's expectations of success and failed to consider the disparity in positive indicators of success identified in Eagle Hill's and PotomacWave's respective proposals.  *Id.* at 36.

The record does not support Eagle Hill's argument.  Contrary to Eagle Hill's contention that the CO ignored the positive discriminators, the CO instead first acknowledged that "[a]ll Offerors received an overall rating High Confidence recognizing a clear understanding of the

requirement, related Corporate Experience, and the number of strengths documented in their proposals." AR 1566. At the same time, however, "each Offeror had numerable observed areas that lowered confidence of success, [and] some had a higher count than others." *Id.* Accordingly, the CO conducted a "deeper review" of the areas that lowered the Agency's confidence "to determine if the areas of concern would result in a low, moderate, or high impact in terms of overall contract success as it related to the PWS." *Id.* She determined Eagle Hill was not the highest rated offeror because "[t]here were two notable areas of concern that lowered the Government's confidence," specifically, Eagle Hill's failure to fully address Questions 2 and 5. AR 1567.

Thus, it cannot be said that the Agency disregarded the bases that increased its expectations of success in Eagle Hill, but rather the CO acknowledged Eagle Hill's High Confidence rating and subsequently downgraded Eagle Hill due to its failure to "thoroughly address" all the RFQ requirements. *Id.* Eagle Hill may disagree with FEMA's overall evaluation of its Corporate Experience proposal, but mere disagreement is not enough to sustain Eagle Hill's protest. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011). Given the significant discretion afforded to procurement agencies, the Court will not second guess FEMA's judgment here.

Finally, Eagle Hill argues that FEMA's evaluation of PotomacWave under Factor 1 Corporate Experience was unreasonable since PotomacWave did not provide "specific and verifiable" information for FEMA to determine that PotomacWave's prior experience examples for Questions 2 and 4 were relevant to the RFQ and occurred within the required three-to-five-year range. ECF No. 23 at 36–38. Eagle Hill notes that PotomacWave's proposal omitted identifying information such as contract numbers, points of contact, contract value, and contract size. *Id.* at 37.

The Solicitation, however, did not dictate the specific types of information that offerors should provide to demonstrate relevancy and recency.  For Corporate Experience Questions 2 and 4, the RFQ stated only that the offeror shall provide "specific and verifiable information" for examples of past experience from the last three to five years.  AR 1025; *see* AR 1026.  The RFQ did not state any more particular or granular requirements for the offeror to format its submission. Accordingly, the fact that PotomacWave's proposal does not contain information such as contract numbers, points of contact, contract value, and contract size does not violate the RFQ.  Moreover, a careful review of PotomacWave's proposal demonstrates that it did provide sufficiently "specific and verifiable" details, including the name of the contract or project, the agency for which the work was performed, the periods of performance, and the nature of the work performed, for the examples it provided in response to Questions 2 and 4.  AR 1046–52.  Eagle Hill has not shown how PotomacWave's Corporate Experience proposal failed to comply with the RFQ's "specific and verifiable information" requirement.

### D.    The Administrative Record Sufficiently Documents FEMA's Award Decision.

Finally, Eagle Hill argues that FEMA failed to adequately document its evaluation of the offerors' proposals, as the Administrative Record fails to demonstrate PotomacWave's compliance with the Solicitation's required GSA labor categories and fails to document the CO's consideration, if any, of the 18 aspects of Eagle Hill's proposal that raised the Agency's expectation of successful contract performance under Factor 1 Corporate Experience.[13]  ECF No.

---

[13] As an additional shortcoming regarding the Administrative Record, Eagle Hill also points out that FEMA did not record the oral presentations, though the Agency could have done so using Zoom's recording feature.  ECF No. 23 at 39.  To the extent this point takes issue with the terms of the Solicitation, which notified offerors that the oral presentations would not be recorded, Eagle Hill's objection is untimely and has thus been waived.  *Blue & Gold*, 492 F.3d at 1313–15.

23 at 39.  Eagle Hill contends that the Agency's inadequate documentation deprives the Court of the ability to determine the reasonableness of the Agency's procurement decision.  *Id.*

In a best value procurement, agencies have even greater discretion to determine the proper award than if the contract was awarded upon the basis of cost alone.  *Galen Med. Assoc. Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  Moreover, in contrast to FAR Part 15, "procurements under FAR subpart 8.4 are subject to fewer documentation requirements," and the CO is only required to "'provide[] a coherent and reasonable explanation' of the strengths and weaknesses of the individual quotes based on the RFQ's factors."  *Trillion ERP Venture*, 161 Fed. Cl. at 545.

Here, FEMA's best value decision is supported by the record and falls well within the substantial discretion of the CO.  With regard to PotomacWave's GSA Schedule labor categories, the CO's price analysis stated that the Agency substantiated each offeror's proposed costs by reviewing the proposal and "other information pertinent to ascertain the most accurate analysis."  AR 1569.  This included a review of PotomacWave's GSA Schedule, which includes detailed information about each of its labor categories.  ECF No. 60 at 73:12–20; ECF No. 43 at 51–70.  As the First Cato Declaration explained, "[d]ue to the significant and clear overlap in duties" between the RFQ's labor categories and PotomacWave's GSA Schedule, the CO did not deem "additional analysis . . . necessary to determine that PWC's proposal was responsive and in accordance with the Solicitation."  ECF No. 29-1 at 2 (First Cato Decl. ¶ 4).  Eagle Hill contends this explanation is vague and conclusory.  ECF No. 44 at 1–2.  But PotomacWave's GSA Schedule provides ample information about its labor categories from which the CO, using her expertise and judgment, could draw this conclusion.  Since the RFQ did not require PotomacWave to provide a crosswalk, it stands to reason that the CO need not justify her determination with something similar.  *See*

*Bannum*, 91 Fed. Cl. at 172 (acknowledging that a reasonable explanation satisfying the APA standard of review does not need to be extensive) (citing *Camp*, 411 U.S. at 142–43)).

Additionally, as previously described, the record shows that while Eagle Hill's Corporate Experience proposal was awarded numerous positive indicators of success, FEMA also assigned two negative indicators that lowered the Agency's expectations of success.  *See* AR 1228.  These concerns were carried over to the CO's evaluation and best value determination, where she found that despite Eagle Hill's High Confidence rating for Corporate Experience, Eagle Hill was not the highest rated offeror because of the "two notable areas of concern that lowered the Government's confidence specific to the questions outlined in the RFQ."  AR 1567.  As a result, the CO faulted Eagle Hill for its failure to "thoroughly address" all of the RFQ requirements.  *Id.*  In contrast, the CO concluded that PotomacWave "address[ed] all five elements outlined [in the RFQ] providing confidence the Offeror has a clear understanding of the overall requirements as it related to its Corporate Experience."  *Id.*  This explanation is both coherent and reasonable.  *See Trillion ERP Venture*, 161 Fed. Cl. at 545.  Eagle Hill has failed to explain what additional discussion about the positive indicators was necessary to support a rational explanation of the CO's determination.  As discussed above, a best value determination is not merely a numbers game.  *See McConnell Jones*, 128 Fed. Cl. at 230.

Based on the record and recognizing the broad discretion that courts afford agencies in the procurement process, FEMA sufficiently articulated the reasons supporting its best value determination and award.

### E.    No Injunctive Relief Is Warranted Because Eagle Hill Fails on the Merits.

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3)

"the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  Because Eagle Hill has not succeeded on the merits of its protest, no injunctive relief is warranted in this case.  *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

## IV.  CONCLUSION

For the reasons set forth above, the Court **DENIES AS MOOT** the Government's Motion to Strike (ECF No. 28), **GRANTS** the Government's Motion to Supplement the Administrative Record (ECF No. 29), and **GRANTS IN PART** and **DENIES IN PART** Eagle Hill's Motion to Supplement the Administrative Record (ECF No. 43).  The Court also **DENIES** Eagle Hill's Motion for Judgment on the Administrative Record (ECF No. 23), **GRANTS** PotomacWave's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (ECF No. 25), and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 30).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after May 1, 2024, unless the parties submit **by no later than April 26, 2024**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: April 19, 2024                                    */s/ Kathryn C. Davis*
                                                          KATHRYN C. DAVIS
                                                          Judge